United States Gypsum Company, Appellee, v. Barnet
  Faroll et al., Trading as Faroll Brothers, Defend-
  ants Below.
  Appeal of Chauncey J. Jones, Appellant.

Gen. No. 39,909.

48

Opinion filed June 21, 1938.

SOLOMON & BORDEN, of Chicago, for appellant; JOHN J. ENRIGHT, JR., of Chicago, of counsel.

MAYER, MEYER, AUSTRIAN & PLATT, of Chicago, for appellees Barnet Faroll *et al.;* FREDERIC BURNHAM, DAVID F. ROSENTHAL and JACOB X. SCHWARTZ, all of Chicago, of counsel.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

United States Gypsum Company filed an interpleader suit in the superior court to determine the ownership of 157 shares of its stock, as between Faroll Brothers, brokers, and Chauncey J. Jones, the original owner of the stock. The matter was referred to a master, who recommended a decree in favor of Faroll Brothers and against Jones, and a decree was entered in accordance with the master's recommendations, from which Jones appeals.

The essential facts disclose that October 26, 1931, Jones was the owner and holder of record of three

certificates representing a total of 157 shares of United States Gypsum Company stock, which he had theretofore indorsed in blank. On that day one George F. Fay induced Jones to deliver to him the said certificates, so indorsed, upon the representation by Fay and his associates, Clark and Turek, that the certificates, with certain other securities delivered at the same time by Jones, would be used by them as collateral in the purchase for Jones of stock in a corporation known as the Consolidated Carribean Oil Corporation. It appears that Jones had been led to believe at the time that if he purchased this stock it could be disposed of by him within a few days at an enhanced value. Instead of using the Gypsum stock as collateral Turek delivered the certificates to A. M. Rohr, a dealer in securities, who was related to Turek. Rohr was no stranger to Faroll Brothers, having been their customer for about eight months prior to October, 1931, and in fact from March 11, 1931, to October 28th of that year Rohr had had some seventy-five unquestioned transactions with Faroll Brothers. October 27, 1931, Rohr delivered the Gypsum stock to Faroll Brothers, with instructions to sell the same, and on that day the stock was sold by Faroll Brothers through the New York stock exchange, of which they were members, at the current market price. On October 28th Faroll Brothers paid Rohr $3,971.50, the net proceeds of the sale after deducting the transfer tax and commission. In the meantime Jones had become suspicious of Fay and his associates, and under date of October 28, 1931, unknown to Faroll Brothers, sent United States Gypsum Company in Chicago a notice to stop transfer of the stock. When the certificates sold by Faroll Brothers were presented to the Gypsum Company's transfer agent in New York, transfer was refused, and thereupon, complying with their obligations as members of the New York stock exchange, as well as with the cus-

tom practiced among brokers, Faroll Brothers replaced the questioned certificates with certificates of like kind and amount, which they purchased in the open market. Thereafter, November 3, 1931, one Marshall, who had been requested by Jones to trace his stock, learned of the sale by Faroll Brothers and on inquiry was advised that it had been sold for Rohr. This appears to have been the first time that Faroll Brothers had any notice that Jones claimed an interest in the stock. The original Gypsum stock certificates, which had been delivered by Rohr to Faroll Brothers to be sold, were retained by United States Gypsum Company, the plaintiff, after transfer was refused, and were in that company's possession when the interpleader suit was filed.

From evidence adduced upon the hearing before the master it appears that Fay and his associates came to Jones with letters of introduction from the Chase National Bank, which appear to have been forged. They knew that Jones owned some Consolidated Carribean Oil Corporation stock, and sold him for cash some 25,000 additional shares of that stock, but the certificates which were delivered to him for this stock were forgeries. Having persuaded Jones to acquire still more of the Consolidated Carribean Oil Corporation stock, he delivered to Fay the certificates for the Gypsum stock in question, together with certificates of United States Steel and Gillette Safety Razor Company stock, all indorsed by Jones, to be held as collateral for the additional stock they had persuaded Jones to purchase. Immediately thereafter Fay and his associates began to sell the stock that had been received from Jones. United States Steel stock was delivered to Wayne Hummer & Company, the Gillette stock to John F. Clark & Company, and the Gypsum stock was delivered by A. M. Rohr to Faroll Brothers, with directions that it be sold.

It is argued by Jones that Faroll Brothers had actual notice of facts concerning Rohr's character and reputation sufficient to place them on guard, and that if they had complied with the rules and regulations of the New York stock exchange, of which they were members, they would have learned that Rohr bore a questionable reputation, would never have accepted him as a dealer, and would not have made a check payable to him in any transaction involving stock registered in the name of a third person.

The master found, however, that Rohr first commenced doing business with Faroll Brothers March 11, 1931; that they continued to handle his account for a period of eight or nine months thereafter; that during this period there were a total of seventy-five transactions which were consummated without any difficulty; and that although Rohr had been previously refused a license to deal in securities by the Illinois Securities Department because of his inability to furnish a satisfactory surety bond, and also because of his questionable reputation among brokerage houses in Chicago, Faroll Brothers had no knowledge at the time of the transaction of any facts which would have cast suspicion upon Rohr.

It also appears from the evidence that in March or April, 1931, when Rohr started doing business with Faroll Brothers, they made an inquiry at the Chicago Stock Exchange to determine whether that body had any information against Rohr, and were advised that the records of the stock exchange showed no charges or claims against Rohr at any time. In May, 1931, Faroll Brothers received a written report from a mercantile agency regarding Rohr and his financial responsibility, which showed that Rohr had a net worth between $50,000 and $60,000, which was regarded by Faroll Brothers as much better than the average investment dealer; that he was registered under the

Illinois securities law to operate as a broker, that two banks had given him letters of recommendation; and that a stock exchange firm, which had made purchases and sales for Rohr over a period of three months, reported that its dealings with him had been satisfactory. These circumstances, together with the fact that Faroll Brothers had already been dealing with Rohr for some time and had no reason to suspect any of his transactions with them, evidently induced the master and the chancellor to find that Faroll Brothers were acting in good faith, without notice, when they sold the Jones stock for Rohr, and upon the record we are not disposed to question that finding.

The law appears to be well settled, irrespective of statute, that where an owner of stock has indorsed in blank the certificates therefor, and has entrusted them to an agent, and a broker, at the request of the agent, sells the securities, the broker is not guilty of conversion or accountable for the proceeds of the stock, even though the owner gave the agent no authority to sell. In *Russell v. American Bell Telephone Co.*, 180 Mass. 467, plaintiff's intestate entrusted a certificate of stock, indorsed in blank, to an agent, who instead of using it for the purpose for which it had been given to him, obtained an advance from the defendant by pledging the stock. Suit was brought to restrain the transfer of the certificate and procure the issuance of a new one. No statute was there involved. The Supreme Court of Massachusetts had previously held in *Scollans v. Rollins,* 179 Mass. 346, that where a certificate of stock indorsed in blank had been entrusted to an agent, the latter could pass title to a bona fide purchaser for value, irrespective of the purpose for which the certificate had been delivered to an agent, but that a different rule would apply where the certificate, indorsed in blank, had been stolen from the owner, and in holding that the plaintiff in the *Russell* case could not set aside the

pledge, the court said (pp. 469, 470): ''In order to avoid the intimations of *Scollans v. Rollins,* the plaintiff sets up that in this case only the possession of the certificate, not the property, passed to the agent and that, as the possession was obtained by fraud, it was obtained by larceny in judgment of law. In *Scollans v. Rollins,* it is admitted that the general principle there laid down would not apply to an instrument indorsed in blank and stolen before it had been transferred. . . . The qualification of the rule, as not applying when the instrument is stolen, is not based upon the name of the agent's crime, but upon the fact that in the ordinary and typical case of theft the owner has not intrusted the agent with the document and therefore is not considered to have done enough to be estopped as against a purchaser in good faith. . . . But in a case like the present the agent has been intrusted with the converted property, and it is totally immaterial whether, by a stretch which extends larceny beyond the true field of trespass, his wrong has been brought within the criminal law or not. The ground of the estoppel is present and the estoppel arises.''

In *National Safe Deposit, Savings & Trust Co. v. Hibbs,* 229 U. S. 391, which arose in the District of Columbia where the Uniform Stock Transfer Act was not in force, a bank entrusted to a clerk certificates of stock which had been indorsed in blank and deposited with it as collateral. The clerk, in gross breach of his duty, sold the certificate through a broker, who paid over the proceeds to the clerk. The bank thereupon sued the broker for conversion. The Supreme Court, in affirming the trial court, said (pp. 394, 397):

''Stock certificates are a peculiar kind of property. Although not negotiable paper, strictly speaking, they are the basis of commercial transactions large and small, and are frequently sold in open market as negotiable securities are.'' Then, quoting from *First Nat.*

*Bank v. Lanier,* 11 Wall. 369, to the effect that, "whoever in good faith buys the stock, and produces to the corporation the certificates, regularly assigned, with power to transfer, is entitled to have the stock transferred to him," the court concluded by adopting the rule laid down in *Russell v. American Bell Telephone Co., supra,* saying:

"We think this case [*Russell v. American Bell Telephone Co.*] correctly states the principle, and, applied to the case in hand is decisive of it. Here one of two innocent persons must suffer and the question at last is, Where shall the loss fall? It is undeniable that the broker obtained the stock certificates, containing all the indicia of ownership and possible of ready transfer, from one who had possession with the Bank's consent, and who brought the certificates to him, apparently clothed with the full ownership thereof by all the tests usually applied by business men to gain knowledge upon the subject before making a purchase of such property. . . . The bank's trusted agent, in gross breach of his duty, whether with technical criminality or not is unimportant, took such certificates, thus authenticated with evidence of title, to one who, in the ordinary course of business, sold them to parties who paid full value for them. In such case we think the principles which underlie equitable estoppel place the loss upon him whose misplaced confidence has made the wrong possible."

Various other courts, upon pertinent facts, have generally followed this doctrine, in the absence of statute, holding that a broker, selling indorsed certificates at the request of an agent for the owner, to whom the certificates have been entrusted, is not guilty of conversion or accountable for the proceeds of the stock, even though the owner gave the agent no authority to sell the same. (*Powers v. Pacific Deisel Engine Co.,* 206 Cal. 334, 274 Pac. 512.) In *National City Bank v.*

*Wagner,* 216 Fed. 473; the court said (p. 480): "Even though only the bare custody thereof [the stock certificate] be intrusted to another who, in complete breach of his duty, disposes of them to an innocent purchaser, the title of the original owner is lost" (citing *National Safe Deposit v. Hibbs,* 229 U. S. 391), "and that, too, though this custody was obtained by deceit and fraudulent representations" (citing *Russell v. American Bell Telephone Co.,* 180 Mass. 467). *Otis v. Gardner,* 105 Ill. 436, *McCarthy v. Crawford,* 238 Ill. 38, *Johnson v. Milmine,* 150 Ill. App. 208, and *Patterson v. Fitzpatrick McElroy Co.,* 247 Ill. App. 81, all collected in 73 A. L. R. at p. 1405 *et seq.,* sustain the general doctrine that an owner of a certificate of stock, who indorses it in blank and entrusts it to an agent under instructions which do not authorize the agent to sell, is bound by an estoppel which precludes him from recovering from a bona fide purchaser for value to whom the agent, in violation of his instructions, sells the stock.

Jones's counsel cite and discuss cases decided in various jurisdictions dealing with the liability of stock brokers handling stolen securities, and they argue that the courts of this State have seen fit to hold the stock broker liable, even though he innocently handles such securities. *Burns v. Shoemaker,* 172 Ill. App. 290, and cases in Maine, Nevada and California are cited. It appears, however, that all of these cases involve securities which were taken from the owner without his consent and were not entrusted by him to the wrongdoer, as in the case at bar. Moreover, all of these cases were decided before the Uniform Stock Transfer Act was in force in any of the jurisdictions involved.

The rule hereinbefore discussed was adopted and incorporated in the Uniform Stock Transfer Act of this State in 1917, and by the State of New York, where the certificates were sold by Faroll Brothers in 1913.

(Secs. 1, 5, 6, 7 and 20, ch. 32, Uniform Stock Transfer Act, Ill. Rev. Stat. 1937 [§§ 416, 420–422, 435; Jones Ill. Stats. Ann. 32.195, 32.199–32.201, 32.214].) It is urged by counsel for Faroll Brothers that in adopting the rule that an owner who entrusts a certificate of stock indorsed in blank to a person who violates his trust is estopped to claim title as against a bona fide purchaser of the certificates so indorsed, for value without notice, the legislature has gone further than the decisions preceding the enactment of the Uniform Stock Transfer Act, so as to embrace instances where certificates of stock were stolen or taken from the owner without his consent, and they cite vol. 6 of Uniform Laws, Annotated, containing notes of the commissioners who prepared the act, wherein the note to sec. 5 states that the act gives full negotiability to certificates of stock. Meyer, in his text on the law of stock brokers and stock exchanges, at p. 517, makes the following statement: ''In New York and other States which have adopted the Uniform Stock Transfer Act, stock certificates which are assigned by their owner in blank have the qualities of negotiable instruments. A purchaser in good faith and for value of a certificate so assigned acquires good title as against the true owner, even if the transfer was without authority, and even if the certificate was obtained from the true owner's possession by theft or other illegal means.''

In *Peckinpaugh v. Noble & Co.*, 238 Mich. 464, plaintiff claimed to be the owner of stock under a certificate indorsed in blank and pledged as collateral security by one who had no right thereto, and he sought to replevin the stock from the pledgee. The court held, however, that the Uniform Stock Transfer Act, which was in force in Michigan, protected a bona fide purchaser, even though he had bought from a thief, and characterized the act as follows (p. 471): ''The Uniform Stock Transfer Act is all-inclusive and admits of

no exception, even in case of theft or felonious taking from the owner, affecting the rights of a good-faith purchaser. If such exception should exist it will have to be so provided by legislation and not by way of judicial amendment."

In *Turnbull v. Longacre Bank,* 249 N. Y. 159, the court, in discussing the Uniform Stock Transfer Act, said (pp. 164, 165): "It is evident that . . . an innocent purchaser for value of certificates of stock indorsed in blank is fully protected. In that respect, though delivery was made by one who, being a thief, had himself neither right of possession or authority to transfer title, such certificates possess the attributes of negotiable instruments." And in *National City Bank v. Wagner,* 216 Fed. 473, the court said that under the Uniform Stock Transfer Act "stock certificates . . . even though stolen . . . are made fully negotiable."

The case proceeded to a hearing before the master upon the question whether Faroll Brothers were entitled to the Gypsum stock as bona fide purchasers for value, free and clear of all claims on the part of Jones. Faroll Brothers sold the Jones's stock and purchased the stock with which to replace it in 1931. For approximately five years thereafter Jones made no offer to pay Faroll Brothers the sum of $2,987.81, paid by them for the replacement of the original Jones's stock. The hearing before the master had put in issue only the question as to whether Jones or Faroll Brothers were entitled to the certificates in controversy. After a full hearing upon the complaint and original answer of the defendant, the master completed his report in April, 1935, to which objections had been argued and overruled, and then for the first time Jones's counsel petitioned the court for an order to reopen the proceeding, and it was not until the month of May, 1936, that Jones, in his amended answer, for the first time indi-

cated that he was willing that Faroll Brothers should be reimbursed to the extent of the $2,987.81 which they had so expended. His counsel now argue that Faroll Brothers are not doing equity, because they seek to retain the stock, whereas Jones is doing equity because he offers to repay Faroll Brothers the amount which it cost them to buy the stock which they used to replace the Jones's stock. It comes rather late in the proceeding, after litigating the merits of the cause on one theory for some four or five years, to file an amendment and then argue the question of equities. We think the litigation should be determined upon the basis of the pleadings and the evidence adduced before the master, and that question is not whether Faroll Brothers should be required to accept Jones's tender, but whether Jones or Faroll Brothers, who are both claimants of the stock, are entitled to the certificates in controversy. Counsel for Faroll Brothers cite and quote from *Gruntal v. National Surety Co.*, 254 N. Y. 468, and upon oral argument expressed the view that this case was controlling upon the issues here involved. Plaintiffs in that proceeding were stock brokers and members of the New York stock exchange. One of their customers at various times brought them certain stolen bonds to be sold. These bonds were sold by Gruntal, and the proceeds delivered to their customer. It does not appear whether the customer of the brokers was a party to the theft or not, but it is evident that the brokers had no knowledge of the fact that the bonds had been stolen. After sale the bonds were returned to the brokers as stolen bonds, and under the rules of the New York stock exchange Gruntal was required to and did replace them. This left them with the stolen bonds on hand, which they could not dispose of until title thereto had been cleared. As action was then brought by the insurance company which had insured the owners of the stolen bonds, to determine the title thereto. The court held that the brokers became bona

fide owners for value of the stolen bonds when they replaced them in the hands of the persons to whom they sold them by bonds which they purchased in the open market, and that the owners of the stolen bonds had lost all title thereto. In discussing the question under consideration, the court said (p. 472):

"When the brokers took back the stolen bonds, as above stated, they paid value for them; they made good their delivery by substituting other bonds of like kind and nature. *At that time they were not acting as agents for Katz and Lewin, but in their own right, and in fulfillment of their own obligations. The substituted bonds were their property. The agency for their customers had terminated. They, therefore had all the rights of these holders in due course, unless they came within the exception; that is, were parties to the fraud or illegality affecting the title to the bonds.* . . . Both at common law and under the Negotiable Instruments Law, a holder in due course of negotiable paper takes good title even from a thief. . . . United States Government bonds, payable to bearer, and like bonds of corporations, circulate today as freely as money; title passes by delivery. A broker accepting such securities for disposition on behalf of a customer has little or no means of warning or inquiry, such as indorsements or other relationships might suggest. . . . We are inclined to the view that the plaintiffs in this case were not liable for conversion, when, in behalf of an apparently honest customer with whom they had had past dealings, and without any cause whatever for suspicion, they sold for his account negotiable corporate bonds payable to bearer. *This being so, the plaintiffs, upon reacquiring the stolen bonds for value, became holders in due course and owners thereof.*" (Italics ours.)

We regard this case as precisely in point. In fact Faroll Brothers stand in a better position than the brokers in the *Gruntal* case, because the certificates of

stock were not taken from the owner without his consent, but were entrusted by him to a person who proved unfaithful to his trust. The doctrine enunciated in *Gruntal v. National Surety Co., supra,* was approved, under similar circumstances, in *Strassburg v. Montgomery,* 56 Nev. 183, 47 P. (2d) 859.

In Meyer on Stock Brokers and Stock Exchanges, p. 523, the author states the principle of law involved as follows: "Under the rules of the New York Stock Exchange and of other stock exchanges, a broker who sells securities which were theretofore lost by or stolen from the true owner, or the title to which is called in question, must replace them with other securities of like kind and amount. If the securities have passed through the hands of several brokers the duty to replace them rests on the one who first introduced them into the market. The courts have held that a broker who is required to replace securities under these rules may, as a bona fide purchaser for value, retain the lost or stolen securities which he has been compelled to replace." (Citing *Gruntal v. National Surety Co.,* 254 N. Y. 468.)

After a careful consideration of the various questions of law and fact involved, we are of the opinion that the chancellor properly held that title to the 157 shares of United States Gypsum Company stock in question had vested in Faroll Brothers as bona fide purchasers thereof for value, and perceiving no reversible error in the proceedings the decree of the superior court should be and is hereby affirmed.

*Decree affirmed.*

SCANLAN and JOHN J. SULLIVAN, JJ., concur.