People ex rel. Oscar Nelson, etc., Plaintiff, v. Depositors State Bank, Defendant.
Kathryn A. Calek, Appellee, v. Charles H. Albers, Receiver of Depositors State Bank, Appellant.

## Gen. No. 41,131.

HEBEL, J., dissenting.

Opinion filed June 19, 1940. Rehearing denied September 10, 1940.

WOODS, WOODS, BROWN & SALTER, of Chicago, for appellant; CHARLES H. BLUMENFELD, of Chicago, of counsel.

HARRY O. ROSENBERG, of Chicago, for appellee.

MR. PRESIDING JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

This is an appeal from an order entered in the liquidation proceedings of the Depositors State Bank, based upon an intervening petition filed by Kathryn A. Calek, praying for the return of certain shares of stock of Commonwealth Edison Company from Charles H. Albers, as receiver of that bank. The matter was referred to a master in chancery, who in his report found the issues in favor of the receiver and recommended that the petition be dismissed and that the stock in question be decreed as belonging to the receiver, as pledgee.

At the hearing before the trial judge the exceptions of the petitioner to the master's report were sustained and a decree was entered finding that the petitioner was the owner of and entitled to possession of the stock.

No point is made on the pleadings.

Petitioner's theory of the case is that the stock certificates were her sole property; that they were attempted to be pledged to the bank by her husband without her knowledge, consent or authorization; that the bank had notice that her stock was attempted to be hypothecated without her knowledge, consent or authorization; that an agreement was entered into between her husband and the cashier of the bank to the effect that the bank would accept and use her said certificates as collateral only on the condition and in the event that her husband would procure her power of hypothecation; that since said power of hypothecation was never obtained, the bank and its successors never acquired title or possession of the certificates, but held the same merely as a custodian for her.

Petitioner further contends that the bank knew and was charged with notice that the stock was attempted to be hypothecated without her knowledge, consent or authorization; that the bank was not a bona fide holder for value, without notice and that it had knowledge of facts which made taking of the stock wrongful. Petitioner further contends that the obligation under the agreement of March 28, 1931, was the obligation of James A. Calek; that petitioner was in no way obligated

on said agreement, and that the bank knew and had reason to know that her husband was her fiduciary and was presenting her stock, without her knowledge, consent or authority for the purpose of fulfilling his own obligation to the bank, which fact made said bank liable to petitioner.

Petitioner further contends that the consideration for the contract of March 28, 1931, failed; that the obligations assumed by Calek under said contract were those of "a guarantee for collection," and that his liability thereunder is secondary and conditional; that said conditions constituted the consideration for his assumption of the liability as guarantor; that said consideration was not performed and failed in these particulars:

(1) There was no "contemporaneous herewith delivery" of collateral by anybody;

(2) One of the parties thereto, Joseph Hitt, did not deposit any collateral at any time; and

(3) Neither the Depositors Bank nor its successors liquidated the assets and liabilities of the Southwest Bank within a period of two years, and in fact have not as yet completed such liquidation. Therefore, Calek as a guarantor has been released of his liability and the Depositors Bank has no legal claim to the certificates of stock under any circumstances whatever.

The receiver's theory of the case is that the stock was, in fact, the property of James A. Calek, petitioner's husband, and that said stock had been deposited in discharge of an obligation of James A. Calek and he had obligated himself and had deposited this stock with the Depositors State Bank and in so doing was disposing of his own property.

It is further contended by the receiver that the stock certificates being indorsed in blank by petitioner, they were in effect negotiable by virtue of the Uniform Stock Transfer Act, and that the delivery of said stock by James A. Calek to the Depositors State Bank was a good and valid delivery and constituted the bank the

pledgee thereof with complete power and authority to retain said stock pursuant to the terms of said collateral agreement.

It is further claimed on behalf of the receiver that the bank was a bona fide purchaser for value at the time of the taking of said stock and that the delivery was not conditional, but was legally and unconditionally effectuated.

·The receiver further contends that the petitioner had knowledge of her husband's intention and desire to hypothecate said stock, and in permitting her husband to obtain possession of said stock while it was indorsed in blank and to deliver it to the Bank she estopped herself to assert any right to said shares of stock as against the Depositors State Bank and the receiver.

The receiver further contends that any right, title or interest in or to said shares of stock which may be vested in the petitioner is subordinate to and inferior to the rights of the receiver to retain said stock as pledgee thereof.

It further appears that on or about October 2, 1931, the petitioner, Kathryn A. Calek, was the owner of four certificates representing 59 shares of common stock of the Commonwealth Edison Company, which said certificates were registered on the books of said company in her name. Upon the reverse side of each of said certificates appeared her signature under the printed blanks for assignment and power of attorney. It appears that this signature was put there, as Calek terms it, for "probate purposes" or rather as we see it for nonprobative purposes, so that either Calek or his wife could appear as the owner of such stock as it suited their convenience.

It further appears that these certificates of the Commonwealth Edison stock were in a safety deposit box held jointly by Calek and his wife in the Depositors State Bank, of which Calek was vice-president and a director. This bank was in financial straits and the said Calek, as an owner of stock in said bank made an agree-

ment with the bank which was termed a ''Take-Over Agreement'' of March 28, 1931, by the terms of which Calek agreed with the bank to guaranty the losses of the said bank.

It further appears that on October 2 or 3, 1931, he presented the said certificates of Commonwealth Edison Company to one Ratajczak, cashier of said bank, in attempted compliance with the terms of this agreement. Under the terms of the so-called ''Take-Over Agreement'' the Depositors State Bank took over all the assets and assumed all of the liabilities of the Southwest State Bank and agreed to liquidate all the liabilities within a period of two years; that in the event the liquidation of the assets and liabilities showed no deficiency, the excess or unused assets were to be returned to the Southwest Bank.

It further appears from paragraph 3 of said agreement, that certain individuals, all stockholders of the Southwest Bank, among whom was Calek, agreed to assure and guaranty to the Depositors Bank the collection of the assets of the Southwest Bank in an amount equal to the deposit liabilities assumed, with a limitation on their guaranty of $150,000; that five of the individual guarantors also agreed to pledge collateral satisfactory to the Depositors Bank for varying amounts, among them was Calek for $40,000 and Joseph H. Hitt for $20,000; that this collateral was to be deposited and ''contemporaneously herewith delivered.'' The agreement further provided that if the collection or liquidation of the assets did not equal the deposit liabilities assumed within a period of two years, the collateral was to be sold upon certain terms and conditions and the proceeds thereof were to be applied upon any balance remaining due the Depositors Bank by reason of its having assumed the liabilities of the Southwest Bank.

The agreement further provided that the complete liquidation of all of the assets so transferred and as-

signed to the Depositors Bank was to be made within two years from the date of the agreement, and if not so liquidated the Southwest Bank and individual guarantors were to become joint and several debtors of the Depositors Bank.

The collateral agreement contained a list of the collateral agreed to be deposited by the various individuals. Calek was listed for several items aggregating $40,000, among which was "59 shares Commonwealth Edison stock."

The collateral agreement, paragraph 1, further provided that all securities deposited by the individuals shall be held by Depositors Bank as security for the obligation created by the guaranty in the agreement.

The Depositors State Bank became insolvent on January 18, 1932, and has been continuously and is now in the hands of a receiver.

Intervening petitioner claims that on March 28, 1931, there were seven certificates of Commonwealth Edison stock, totaling 59 shares, which belonged to her, Mrs. Calek, but which stood in the name of her husband, and which were indorsed in blank by him. It is further claimed that her husband, acting for her, had bought various certificates for her with her funds at a cost of $7,626.39; that said purchases were made during the course of the years from 1924 to 1931 by the use of "rights," some of which were issued directly and some of which were purchased from private parties and from the Commonwealth Edison Company.

The evidence further shows that the funds of petitioner were deposited in her savings account in the Southwest State Bank and Depositors State Bank and that she was also the owner of several Christmas Savings Club accounts, which in the years 1925, 1926, 1927 and 1928, paid her the sum of $13,998.70.

It is claimed that after the agreement of March 28, 1931, had been signed, Calek disclosed to his wife that he had agreed to pledge her Commonwealth Edison

stock; that she became hysterical and insisted upon having the stock in her possession at once; that the next day he delivered all of the certificates to her and she kept them in her possession in a steel box in a chest at home.

It is further claimed that subsequently she asked her husband to have the certificates registered in her own name, which he did, and they were put in a safety deposit box at the Depositors State Bank. These are the certificates which are sought to be reclaimed in this suit.

The evidence before us shows that Calek and his wife had confidence in each other and Calek testified to instances when the stock was in his name and was indorsed because "my wife had that much confidence in me. She just bought it and put it in my name and endorsed it in blank so that if anything happened to me she wouldn't have any difficulty transferring it. Just a custom among our people. . . ."

James Calek, when testifying later, stated that he went to the Continental Bank; that he had the stock transferred to his wife's name and on October 3, 1931, a few days thereafter, he received the certificates which contained a blank indorsement on the reverse side; that the indorsement was his wife's signature.

The evidence further shows that their transactions were interchangeable, some of the bank accounts being in her name and some in his name. The gist of Calek's testimony was that the financial relationship between himself and his wife was arranged so as to keep their stock in either one's name, regardless of who owned it, so that they could avoid costs and expenses in the event their ownership was questioned.

The evidence further shows that Calek represented his wife throughout their married life with regard to financial transactions. Calek was the most interested party, so his evidence must be weighed with that in mind.

Calek was the head executive officer of the Southwest

Bank·and after the auditors had threatened to close the bank, for the reason that the directors had exceeded the statutory loaning limit, Calek was willing at that time to give up all his assets so that the Southwest State Bank would not have to close and he would not be subject to further liability as a director. He offered to give anything he possessed and he signed a contract with this in mind, which contract was approved by the auditor of public accounts, Calek agreeing to put up this identical 59 shares of Commonwealth Edison stock, which at that time was in his name.

Calek's testimony contained the statement that on March 28, 1931, after he had signed the agreement, he told his wife that the Southwest State Bank and the Depositors State Bank had merged and that he was putting up all "our" collateral, including the 59 shares of Commonwealth Edison stock which was recorded in his name at that time and had been in his name ever since it was purchased, that is from 1924 until 1931, which stock certificates had remained in the safety deposit box, under his control. Calek claimed this stock was his own, and in all his conversations led the Depositors State Bank to believe this to be a fact.

Further testifying Calek stated that he pleaded with his wife to let him keep the 59 shares of stock, after he had signed the collateral agreement and after he had deceived the auditor of public accounts and the Depositors State Bank into believing that he could make good his agreement. He admitted that when he signed the document agreeing to put up this identical stock, he had misrepresented the facts to the Depositors State Bank and to the auditor and, although he was civilly liable in an action of fraud, he must have known that he misrepresented facts to the bank and the auditor in order that the "take-over" would go through. He readily testified that he had led his wife to believe that the stock was in the safety deposit box, whereas, he had taken it out and had turned it over to the bank.

We think Calek's testimony is incredible. It is quite apparent that he manipulated his assets so as to accomplish his purposes and that his wife had agreed to aid him in this regard. Calek's testimony, relative to asking that his Commonwealth Edison stock be released as it belonged to his wife, was refuted by George H. Webb and Frank L. Webb. Calek also stated that he did not remember having talked with Mr. Smietanka, asking the latter to represent him, Calek, and get the collateral back because at the time it was put up a Mr. Hitt had also agreed to deposit collateral, but that he failed so to do.

Mr. Smietanka, a reputable lawyer, contradicted Calek's testimony.

The witness Calek testified that he did not find out that the other collateral had not been deposited by Hitt and others until after the bank had closed, but he also testified that he had talked with Mr. Mathias in this regard prior to the closing of the bank.

Smietanka, called as a witness on behalf of the receiver, testified that Calek was the prime mover in the "take-over"; that Calek was much concerned about the transaction being consummated and that he told Smietanka that he, Calek, could not afford to be embarrassed by having the State auditor close the Southwest State Bank.

Robert D. Mathias, called as a witness on behalf of the receiver, testified that he had no recollection as to having threatened Mr. Calek with being discharged if he did not deposit the Commonwealth Edison stock; that he had no authority to discharge an officer of the bank; that he [meaning Calek] was employed by the board of directors and that the authority to either hire or fire Mr. Calek or other directors and officers was vested in the board of directors.

At another point in his testimony Calek stated that he had talked with Mathias with reference to the stock and that he later delivered the stock to Mr. Ratajczak,

vice-president, and that he promised to get an hypothe-cation agreement, yet Calek admitted that he had never asked his wife for power of hypothecation. He also testified that after the stock was transferred to his wife's name and indorsed in blank by her, he put it into the safety deposit box and took it out that day or the next day and gave the stock to the Depositors State Bank, which was about October 2, 1931, yet the evidence offered on behalf of the receiver shows, as disclosed by the entry card, that as to the safety box of James A. and Kathryn A. Calek, there was no entry made on October 2, 1931, as they had testified.

We have set forth the evidence somewhat in detail as it seems to us that the testimony of Calek was def-initely discredited as he proved to be unreliable as a witness and his testimony could not be used as a basis upon which to make a finding, other than that no re-liance should be placed upon it. We do not find any credible testimony in the record showing that the bank had any knowledge at the time the stock was delivered or at the time of the "Take-Over Agreement" that the property was that of the petitioner and was pledged without her permission. The evidence shows that who-ever was the owner of the stock, it was subject to trans-fer between Calek and his wife as best served their pur-poses. We cannot agree with the contention of counsel for petitioner that the fact that the stock certificates were indorsed in blank by Mrs. Calek, put the bank on notice that a transfer was wrong as to her, so as to con-stitute the bank a wrongful taker thereof.

In the case of *Peckinpaugh v. H. W. Noble & Co.,* 238 Mich. 464, 213 N. W. 859, at p. 861, said:

"In the eye of the law an indorsement in blank of a stock certificate is not a mere inquisitive bit of evidence calling for investigation of rights remaining with the indorser. The indorsement in blank gave power to any possessor of the certificates to pass title by delivery. Indorsement of and delivery by the owner are distinct.

Indorsement must appear; delivery by the owner need not be shown by a good-faith purchaser from one having possession. A pledgee is a purchaser. . . . The Uniform Stock Transfer Act is all-inclusive and admits of no exception, even in case of theft or felonious taking from the owner, affecting the rights of a good-faith purchaser. If such exception should exist it will have to be so provided by legislation and not by way of judicial amendment.

. . .

"Bad faith may, of course, be predicated upon actual notice demanding inquiry. But good faith, in a transaction arising in the usual course of business, demands no *sua sponte* questioning of the title of the possessor of certificates of stock indorsed in blank. Such indorsed certificates do not travel with the ear-mark caveat emptor, but possess veritas nuda. The rule, let the purchaser beware, and the doctrine of suspicion impugning rights of a possessor of indorsed certificates until the contrary is made to appear, would not only unduly retard negotiability demanded in the commercial world, but, in all except extremely rare instances, be considered a gratuitous insult.

"The Uniform Stock Transfer Act accepts common honesty as a concept reasonably safe as a basis of everyday action in the commercial world. . . . Upon the indorsement in blank by the owner a stock certificate becomes a 'courier without luggage, whose countenance is its passport.' " The foregoing case was cited with approval in the case of *United States Gypsum Co. v. Faroll,* 296 Ill. App. 47, at p. 56.

According to the law set forth in the cases just cited, there was no notice of any rights of Mrs. Calek, the petitioner. It seems to us that the position of the petitioner is rather inconsistent as in one part of the testimony counsel attempts to show that the petitioner was an uneducated, inexperienced housewife and that her

only experience in life was that which she had acquired in the discharge of her household duties, yet she admits that she had a savings account totaling almost $6,000, and Calek admits that he had the right to draw on his wife's funds if he so wished. As to the stock Calek said that it was in his name from the day it was purchased until October 2, 1931, the day it was delivered to the bank. The petitioner gave the explanation that she had the stock and on March 28, 1931, when her husband told her he had used it she told him she wanted it back and on October 2, 1931, she stated that she would like to have it put in her own name and it was then immediately indorsed in blank by her and her husband and placed in a safety deposit box to which she and her husband had joint access, which was under his control and that the stock could be taken out without her permission or consent; that she knew of his obligation to the bank and his desire to use the stock.

From a review of this record we are quite satisfied that Mrs. Calek permitted her husband to have the use of her name and that the property was actually his throughout all their business transactions. The only other conclusion that could reasonably be reached would be that he was her agent. We believe that the master who heard the evidence, and whose conclusions in a matter of this kind should be given great weight, rightfully determined that the bank was the owner of this stock and, consequently, said stock should be given to the receiver. From the inconsistent statements made by Calek and his wife, we find nothing upon which we could uphold their contention relative to the stock in question. When applying to a court of equity, equitable rules should prevail. They explain that the indorsements which appeared on the stock were put there for "probative purposes," which in plain words means that it was not to be reported to the probate court in the event the estate of either one of them was subject to probate. A court of equity cannot sanction such

action, they must come into court with clean hands. Not only have they failed to prove the allegations as set forth in the petition, by a preponderance of the evidence, but they have not complied with the rule that, "He who seeks equity must do equity."

For the reasons herein given the order of the circuit court in sustaining the exceptions to the master's report is reversed and the cause is remanded with directions to dismiss said petition for want of equity.

*Order reversed and cause remanded with directions.*

BURKE, J., concurs.

MR. JUSTICE HEBEL dissenting: I am unable to agree with the conclusion of the court in the instant case for the reason that the officers of the Depositors State Bank, a banking corporation, had knowledge of ownership by Kathryn A. Calek of the certificates representing 59 shares of the common stock of Commonwealth Edison Company, which said certificates were registered on the books of the company in her name. These certificates were in a joint deposit box in the Depositors State Bank, which box was in the names of Kathryn A. Calek and James A. Calek, her husband. On or about October 3, 1931, he removed the above certificates of stock and presented them to one Ratajczak, cashier of the bank, in an attempted compliance with a so-called "take-over agreement" of March 28, 1931, to which Calek and the bank were parties. These certificates were offered to the bank without the knowledge, consent or authorization of his wife.

Under the "take-over agreement," the Depositors State Bank took over the assets and assumed all the liabilities of the Southwest State Bank, and agreed to liquidate said liabilities within a period of two years. The Depositors State Bank became insolvent on January 18, 1932, and has been continuously and is now in receivership. The assets and liabilities of the Southwest State Bank taken over and assumed by the Depositors State Bank were not liquidated within a period of

two years and are now in the process of liquidation.

There does not seem to be any question as to the ownership of the certificates of the shares of stock of the Commonwealth Edison Company except that her name appears to have been indorsed on the back of this stock. The facts, however, are that when Mr. Calek, who was an officer of this bank, presented the shares of stock that were called for by the "take-over agreement," his attention was called to the fact that the stock was not deposited by him, and that when he deposited the shares of stock finally, Ratajczak, who was the vice-president and cashier of Depositors State Bank, called his attention to the fact that these shares of stock were not in his name but in the name of Mrs. Calek, his wife, and that unless a power of hypothecation was signed by Mrs. Calek, he could not use the certificates. Calek stated that he would try to get the power of hypothecation, and thereupon the cashier, not wanting to accept them, took the certificates to Mr. Mathias, the president, and called the attention of the president to the condition of the certificates and that they could not be accepted without the power of hypothecation, and that he did not want to accept them. The president, thereupon, stated to Calek that the certificates were in his wife's name; but directed the cashier to take the certificates and to "be sure you get that power from him." However, it appears that Mr. Calek never obtained nor delivered to the bank the signed power of hypothecation of Mrs. Calek.

So, it appears from the facts as related that the shares of stock in question were removed from the box without the consent of Mrs. Calek, and that she had no knowledge of nor did she consent to or authorize the delivery of said certificates to the bank; that during the intermediate time, she received the dividend checks issued by the Commonwealth Edison Company, and there was nothing to create a suspicion in her mind that the certificates had been turned over by Mr. Calek to

 

the bank. Under the circumstances and facts stated here, it appears that the parties had knowledge of the ownership of the certificates in question and that the bank was not a bona fide holder for value without notice.

For that reason I am of the opinion that the court should have affirmed the decree entered by the trial court that the petitioner, Kathryn A. Calek, was the owner of and entitled to the possession of the stock.