ARIE E. HAAS,
Plaintiff,

*vs.*

LEON V. HAAS, GENERAL MOTORS CORPORATION, a corporation of the State of Delaware and GRACE HAAS,
Defendants.

CENTRAL BANK AND TRUST COMPANY, a banking corporation of the State of Florida,
Intervening Defendant.

*New Castle, December 29, 1955.*

*Thomas Herlihy, Jr.,* and *Herman Cohen,* Wilmington, for plaintiff.

*Caleb S. Layton,* of Richards, Layton & Finger, Wilmington, for defendant General Motors Corp.

*James R. Morford,* of Morford & Bennethum, Wilmington, for intervening defendant.

Leon V. Haas and Grace Haas failed to appear and default judgments were entered against them.

SEITZ, Chancellor: On February 17, 1955, plaintiff instituted this action against her husband, Leon Haas ("Leon") and General Motors Corporation. Her complaint showed that until November 1949, certificates for 200 shares of General Motors Corporation stock were registered in the names of plaintiff and her husband as joint tenants with right of survivorship and not as tenants in common. In November 1949, at the request of Leon, plaintiff endorsed such stock certificates so that Leon might deposit them with Equitable Trust Company, Wilmington, as collateral security for a loan. When the loan was paid and the certificates returned to Leon, he fraudulently had them transferred on the books of General Motors to his own name alone. She prayed that the two certificates, each for 100

shares of General Motors stock, registered in Leon's name alone, be re-registered as before. On the same date a restraining order was issued preventing Leon and General Motors from transferring the shares. However, the Court did not then obtain actual control of the certificates.

A default judgment was subsequently entered against Leon and against Grace Haas, his sister, determining that—as between plaintiff and these parties at least—the certificates should be re-registered as plaintiff requested. However, Central Bank and Trust Company ("Bank"), a Florida bank, was subsequently granted leave to intervene and assert a claim because the certificates for the 200 shares of General Motors stock were in its possession. It deposited the certificates in this Court.

This brings us to a statement of the Bank's connection with the two certificates and its claim, the sufficiency of which is here being decided. I should say that the parties have made it extremely difficult to state the Bank's claim precisely because they have filed so many papers. I shall expect counsel to advise me if they feel that my statement of facts exceeds the necessities of the present determination.

On May 12, 1954, Leon borrowed $10,000 from the Bank represented by a demand note. He pledged as partial collateral security (later constituting the only collateral) certificates for 200 shares of General Motors stock. The parties agree that these were the same shares which he had theretofore fraudulently caused to be transferred to his own name. The certificates bore an assignment to Grace or Leon Haas. Because of this assignment (never registered with General Motors) the Bank required both parties to sign the note and submit separate blank stock powers for each certificate with signatures guaranteed by a responsible bank. These conditions were met. The demand note contained the usual provisions including a power to sell any and all of the pledged collateral upon default.

Leon became in default and the Bank made demand for payment of both principal and unpaid interest. On March 25, 1955, the date of the Bank's last demand, and after the date of the restraining order,

Leon directed the Bank to sell the entire 200 shares of General Motors stock. The written direction by Leon to the Bank reads as follows:

"Acting upon my own initiative and own suggestions I hereby request you to enter my order to SELL for my account and risk, on street or exchange subject to the rules and regulations of the exchange in which this order is placed, the securities listed below at (market) (or better). This order holding good until cancelled.

| 200 | Gen Motors | Mkt. | |
|-----|-----------|------|----|
| | | 95½ | 19100— |
| | Postage | | .54 |
| | Transfer Tax | | 8.60 |
| | Commission Broker | | 89.10 |
| | Service Charge | | 5.00 |
| | Total charges | | 103.24 |
| | Net Amount | | 18,996.76 |

Pay Loan of $7000 Balance to be credited to Reg. a/c L. V. Haas and Grace Haas."

On the same day, March 25, the Bank directed its broker, as its agent, to sell the 200 shares of General Motors stock. The broker presumably made the sale on the same date because on that day the certificates and powers were delivered by the Bank to the broker and the Bank received the broker's check for the net sales price. After deducting the amount due it from Leon, the Bank had a surplus of $11,974.88 which it deposited in the checking account of Leon in the Bank.

On March 28, 1955, Leon withdrew all but a few dollars of this balance. The Bank had no actual knowledge of plaintiff's claim prior to the sale and I assume for present purposes that the same was true of the broker. Several days after the withdrawal by Leon, the Bank's broker reported to the Bank that it had submitted the stock certificates to General Motors for transfer and General Motors had refused to make the transfer because of this Court's restraining order. The Bank then repaid its broker for the stock and the certificates

were returned to the Bank with the assignment to the broker erased. Thereafter the Bank inserted its name on the certificates as assignee. The certificates are now on deposit with this Court awaiting this Court's determination of the Bank's claim against such stock.

The Bank's pleading asserts ownership of the certificates. However, at oral argument its counsel conceded that the Bank never in fact purchased the shares. This renders it unnecessary to consider plaintiff's argument that the Bank could not have purchased the stock under Florida law. The Bank now claims that it should be treated "as though" it were an innocent purchaser for value up to its full loss arising from the "sale". I therefore assume that such is its claim for relief rather than the original prayer requesting a declaration of absolute ownership. Plaintiff makes no point of the Bank's change in position.

This then is the decision on plaintiff's defense that the Bank has not stated a claim entitling it to relief. If the Bank has stated a claim entitling it to relief under any theory then plaintiff's present defense must fall.

Since this transaction took place in Florida, I assume the laws of that state control except as to the problems surrounding the negotiability of the stock. General Motors being a Delaware corporation, Delaware law would appear to govern the question of negotiability. Both Florida and Delaware have the Uniform Law.

Plaintiff's argument goes like this: There were two certificates for 100 shares each deposited with the Bank to secure the loan; admittedly the sale of 74 shares of one certificate would have been sufficient to satisfy the loan; the sale of the remainder of the shares by the Bank at Leon's direction made the Bank Leon's agent with respect thereto; as to the proceeds received over and above the amount necessary to satisfy the loan the Bank acquired no greater rights than those possessed by Leon; Leon had no exclusive right to sell and his agent, the Bank, was in no better position as to the excess proceeds and so must bear the loss occasioned by the fraud of its principal.

As stated, the Bank had no actual knowledge of plaintiff's claim either when it made the loan or when it caused the stock to be sold.

Plaintiff concedes that the Bank has stated a claim which would give it a lien on the certificates up to the unpaid amount of the loan and I proceed on that concession.

I next consider the Bank's contention that it has stated a claim entitling it to be treated as though it were a bona fide purchaser for value as to the full amount received from the sale of both certificates.

Preliminarily, I agree with plaintiff's counsel that ordinarily a pledgee has a duty to limit the sale of divisible collateral to the amount necessary to cover the obligation. *Restatement of the Law of Security*, § 53; *Turk v. Grossman*, 176 *Md.* 644, 6 *A.2d* 639. The pledgee-Bank as such therefore had a right to sell only 74 shares because that number would, to the Bank's knowledge, have been sufficient to satisfy its claim. The power given the Bank in the note to sell all collateral relates in my opinion to the necessities of satisfying the loan. It cannot constitute justification for the present sale of all the stock.

We thus have a situation where the Bank, insofar as its pledge agreement and the known facts were concerned, had no right to sell 126 shares. However, it did so on the pledgor's instructions and for the pledgor's account. This it could of course do but as to the sale of this excess the Bank was acting solely as the pledgor's gratuitous agent. But let us see if that relationship continued.

The Bank's claim shows what we must assume was a sale of the entire 200 shares through its broker to a bona fide purchaser for value. If we stop at the sale stage and analyze the situation, I believe it will shed substantial light on our present problem. First the Bank requested its broker to sell the stock and I assume a sale was made.[1] Perfectly proper certificates and stock powers were delivered to the broker who caused full payment to be made to the Bank. The Bank in crediting the excess to Leon's account was still acting as his agent. At this point there was certainly a sale to an unidentified bona fide holder without notice unless it can be said that this pending action

1. I think it would be unreasonable to assume at this stage that the broker purchased for its own account because that would probably have been contrary to the New York Stock Exchange Regulations.

and the outstanding restraining order constituted constructive notice of plaintiff's claim to all prospective purchasers regardless of actual knowledge. This brings us to a consideration of Delaware law because we are dealing with the transferability of stock of a Delaware corporation.

With certain modifications, Delaware has adopted the *Uniform Stock Transfer Act, 8 Del.C.* § 181 *et seq.* The Act applies to the present certificates. Had there been no litigation pending at the sale date, there is no doubt that under our *Uniform Stock Transfer Act* the purchaser would have acquired the status of a bona fide purchaser for value. Plaintiff would have lost all her rights in the shares represented by such certificates. Indeed such would probably have been the case even prior to the adoption of the *Uniform Transfer Act.* Compare *E. I. DuPont de Nemours & Co. v. Laird,* 24 *Del.Ch.* 152, 8 *A.2d* 162; modified 24 *Del.Ch.* 250, 9 *A.2d* 76.

The question then is whether 8 *Del.C.* § 202, being a Delaware modification of a section of the *Uniform Stock Transfer Act,* affects the status otherwise acquired by the purchaser in this case. That Section reads:

> "Nothing contained in this subchapter shall repeal, amend or in any way affect the provisions of section 324 of this title or sections 365 and 366 of Title 10; and to the extent that any provision of this subchapter is inconsistent with such sections, section 324 of this title and sections 365 and 366 of Title 10 shall be controlling."

Section 324 of this Title, referred to in the quoted section, is the statute providing for the attachment of shares of stock, etc., at law. Sections 365 and 366 of Title 10 of the Code, referred to in the quoted section, are the sections which provide the mechanics whereby the Court of Chancery may determine rights with respect to property in this state, § 365, or seize a non-resident's property in this state to compel his appearance, § 366, in connection with a pending action.

The Delaware Court of Chancery exercises jurisdiction with respect to the stock of Delaware corporations on the theory that for certain purposes such property has its situs in Delaware and the

Uniform Stock Transfer Act does not alter this conclusion. See *Krizanek v. Smith,* 32 *Del.Ch.* 513, 87 *A.2d* 871. The Delaware Court of Chancery has jurisdiction to determine rights with respect to the stock of Delaware corporations when jurisdiction under these statutes is properly invoked.

■ This Court therefore still has the right to determine the ownership of stock of Delaware corporations without physical seizure of the certificate. This is the right which I believe 8 *Del.C.* § 202 preserves when it refers to 10 *Del.C.* § 365. However, when this Court decides rights with respect to stock of Delaware corporations under this statute, I believe it must do so with a recognition of rights created by virtue of our *Uniform Stock Transfer Act.* See *Hodson v. Hodson Corp.,* 32 *Del.Ch.* 76, 80 *A.2d* 180; Compare *Weinress v. Bland,* 31 *Del.Ch.* 269, 71 *A.2d* 59. The statute giving this Court jurisdiction of such matters simply establishes the mechanics of service upon non-residents, see *Krizanek v. Smith,*[2] above, and does not purport to freeze rights with respect to the ownership of property which may be brought within its ambit, particularly where "negotiable" indicia of ownership are outstanding.

■ The Bank's pleadings show a sale by Leon through the Bank as his agent to a bona fide purchaser for value without notice. I do not believe the pending action or the outstanding restraining order of which the purchaser had no actual knowledge, constituted constructive notice. Otherwise, the salutary purposes of the *Uniform Stock Transfer Act* would be substantially stultified. This is so because certificates often pass through many hands pursuant to bona fide sales before there is any attempt to have them re-registered. It was to aid this free transfer that the Act was adopted.

■ When a transfer is made by the delivery of certificates and stock powers which are regular on their face, I conclude that a purchaser without knowledge becomes a bona fide holder for value, and this status is not lost even though an action is pending or a restraining order against transfer is then outstanding.

---

2. The Supreme Court also stated in that case that it was not faced with any question of rights of innocent third parties.

The Bank's claim therefore shows a sale to a bona fide purchaser for value without notice. But when the certificates were found to be subject to the restraining order the broker was required by the Stock Exchange Regulations to deliver other certificates to the purchaser. I assume it did so. When this was done the broker stood, as to these certificates, in the position of a bona fide purchaser for value.[3] This would be true, *a fortiori,* up to the amount expended by it to make a "good" delivery.

[10] The broker could have brought an action which would have entitled it to recognition as the owner. Other outstanding equities would then have been foreclosed. Compare *E. I. DuPont de Nemours & Co. v. Laird,* above. However, the broker, having dealt with the Bank, chose to require it to make good. When the Bank reimbursed its broker, which then had the status of a bona fide purchaser for value, it seems to me that the Bank thereby put itself in a position comparable to an assignee from the broker. In repaying the broker the Bank was making good on its own obligation to the broker. When so doing, it was not acting for Leon. Since the Bank has, so far as appears, at all times acted in good faith I believe it is entitled to the protection granted one in the position of a bona fide purchaser for value. To hold otherwise is to make the Bank's liability dependent upon the broker's decision to seek reimbursement rather than to proceed to establish his ownership. I say this because it seems clear that had the broker sought to establish ownership to the exclusion of plaintiff's equity he would have been successful. In that case I do not believe plaintiff would have had any basis for an action against the Bank.

As noted above, the Bank does not claim the ownership of the certificates but only an equitable lien in the full amount of the purchase price returned by it to the broker. I hold that the Bank has stated a claim entitling it to an equitable lien on the stock certificates in that amount.

It is also possible that the doctrine of equitable estoppel might be invoked against plaintiff when the full facts are developed. This

3. *U. S. Gypsum Co. v. Faroll,* 296 *Ill. App.* 47, 15 *N.E.2d* 888; Meyer, *The Law of Stock Brokers and Stock Exchanges,* pp. 523-525.

would constitute an independent basis to support the intervener's claim.

Since the Bank's pleading sets forth claims upon which may entitle it to relief, it follows that the plaintiff's defense that the Bank's pleading fails to state a claim must be overruled.

Order on notice.

